**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AMBITIOUS PRODUCTIONS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 22 C 2088** |
| | ) | |
| **DVAPPS, AB,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Ambitious Productions, Inc. is an Illinois-based company that produced a horror film in 1999 entitled *Granny* ("the film"). AP owns two copyright registrations related to *Granny*, one for the film itself and the other for the film's trailer. DVapps AB is a Sweden-based company consisting of a sole owner and game developer named Dennis Vukanovic. From 2013 to 2017, DVapps developed a series of computer games entitled *Granny*, *Granny Part 2*, and *Granny 3* (collectively, "the game"). AP has sued DVapps for copyright infringement, alleging that the game is strikingly similar to the film in several respects. DVapps has filed a motion for summary judgment. For the reasons set forth below, the Court grants the motion.

**Background**

The following facts are undisputed unless otherwise noted.

**A.      The film**

In 1999, AP produced *Granny*, an approximately one-hour long horror film. The

film tells the fictional story of a group of friends in what appears to be a suburb of Chicago. As the film progresses, the friends are gruesomely murdered one by one by the film's villain, "Granny," who is a man dressed up as an elderly woman. The killer wears a wig of long, gray hair; a rubber mask with wrinkles, gray eyebrows, and a smiling expression; and a blue, ruffled nightgown. The granny character in the film appears as follows:





Compl., Ex. 2 at 1.  The murders take place both inside and outside of a split-level home that appears as follows:



*Id.* at 4.

By the end of the film, the only person in the group not killed by Granny is Michelle, a newcomer.  After witnessing Granny murder each of her friends in turn, however, Michelle appears to suffer from a cardiac episode and dies.  After Michelle's apparent death, it is revealed that the murders were faked as part of an initiation ritual for Michelle.  The friends express remorse for Michelle's unintended death.  At the end of the film, Michelle drives up to observe the group of friends at her funeral, indicating that she, too, faked her own death.

**B.    Copyrights**

AP owns two copyrights related to the film with effective dates of February 26, 1999: Copyright Reg. No. PA 948-525 for the film and Copyright Reg. No. PA 948-524 for the trailer.

3

C.    **Distribution**

AP concedes that "there was not 'theatrical distribution' like a high budget Hollywood movie" for the film.  Pl.'s Resp. to Def.'s LR 56.1 SOF ¶ 65.  Instead, AP contends that, in 1999 and the early 2000s, the film was physically distributed via VHS tapes and DVDs, as illustrated by photos of the packaging it submitted.  It also contends that some photos of the packaging show English-language use, and others suggest that some VHS and DVDs were designed for distribution in the United Kingdom and France. AP therefore contends that the film was released to both the British and French markets in 1999.

DVapps does not dispute the existence of VHS and DVD copies of the film, as illustrated by the photos of the packaging.  DVapps does, however, dispute that these photos demonstrate that, and to what extent, the VHS or DVD copies were ever actually distributed.  DVapps also disputes that any purported distribution to the United Kingdom or France shows that Vukanovic had access to the film in Sweden.

AP contends that, in 1999, the film was licensed for distribution in the United States and internationally by Dead Alive Productions and Spectrum Films, respectively. DVapps disputes this fact, as the images submitted by AP of both licenses are completely unreadable and contain no discernable text other than the alleged licensee's name.  DVapps also disputes that the existence of these alleged distribution licenses is evidence that the film was actually distributed.

In 2005, the film was licensed for distribution by Brain Damage Films.  DVapps contends that the fact that the film was licensed for distribution in 2005 does not show whether and to what to extent it was actually distributed.

4

AP also offered links to Amazon, an online retailer, where one can purchase a copy of the film. DVapps does not dispute that copies of the film can be purchased from resellers on Amazon, but it disputes that this means AP actually distributed the film in 1999 or has been continuously distributing it since then.

AP contends that, on May 23, 2017, the film was streamed on the Internet. To support that contention, AP points to screenshots from the TV/film review-aggregation website, Rotten Tomatoes, stating "Release Date (Streaming): May 23, 2017." Def.'s LR 56.1 SOF, Ex. L. DVapps contends that this third-party website's out-of-court statement is being offered for its truth regarding the date of streaming and is therefore inadmissible hearsay.

Finally, a declaration by Tomas Popovic, a part owner of AP, states that someone uploaded the entire film to YouTube on August 13, 2017, and that as of February 14, 2023, it had 81,000 views. The version uploaded is a Spanish-language version of the film.

**D.    The game**

Vukanovic, the sole owner and programmer behind DVapps, submitted a declaration stating the following. Vukanovic lives in Sweden and has only visited the United States once, in 2019. He has single-handedly developed more than seventeen video games since 2011, some of which are horror-themed, including the games at issue here. Prior to this lawsuit, Vukanovic had never seen or heard of the film.

Vukanovic's development of the game began in 2013 when he created and released a prequel entitled *Slendrina*. In *Slendrina* and the sequel games that followed it, players are challenged to solve puzzles to escape a certain environment in order to

5

avoid being killed by the antagonist, "Slendrina," who is "a pale, thin, demonic girl with haunting features."  Def.'s LR 56.1 SOF, Ex. C, ¶ 10.  The following are images associated with each of the *Slendrina* games that Vukanovic created between 2013 and 2017:



*Id.* ¶ 11.

As a spinoff of the *Slendrina* series, in November 2017, Vukanovic created and released the first iteration of the *Granny* game.  His "idea was to create a character that would be the grandmother of *Slendrina*."  *Id.* ¶ 12.  The game similarly challenged players to solve puzzles and escape within five days an environment—this time a house—to avoid being killed by the antagonist—this time the granny character and, in the second installment, *Granny Part 2*, her husband.  In the third installment, *Granny 3*, the *Slendrina* character joins her grandmother and grandfather in kidnapping and trapping the player in the house.  The three characters are depicted as follows:



*Id.* ¶ 14.

As Exhibit D to its statement of material facts, DVapps submitted videos of various "play throughs" of each iteration of the game that it contends "fairly depict representative gameplay." *Id.* ¶ 16.

AP disputes that the play throughs submitted by DVapps are fairly representative of "what may appear in the games" and says that they are "guided . . . to cause minimization of similarities." Pl.'s Resp. at 2. AP therefore submitted its own version of side-to-side comparisons between short video clips of the game and the film that it contends address "movement, background, or numerous other factors of similarity in the game when compared to the character, background, and movement in the movie." Pl.'s Resp. to Def.'s LR 56.1 SOF ¶ 44. AP also submitted a declaration by Popovic in which he offers his own analysis of side-by-side comparisons of the two works.[1]

---

[1] DVapps challenges on various grounds Popovic's declaration, the "expert witness report" of Martin L. Bernstein, and the declaration of AP's counsel of record, David C. Brezina. But even if the Court were to consider the information in all three submissions, it does not change the outcome of the summary judgment motion. For this reason, the Court need not address DVapps's argument that these submissions should be disregarded and excluded.

**E.** **This lawsuit**

On April 22, 2022, AP filed the present lawsuit against DVapps alleging copyright infringement.  On June 21, 2022, DVapps filed a motion to dismiss AP's claim.  On September 8, 2022, the Court terminated DVapps's motion to dismiss without prejudice to filing a motion for summary judgment.  On October 7, 2022, AP filed a motion for summary judgment asserting two bases: the absence of substantial similarity in any protectable expression, and the absence of access on the part of DVapps to AP's work. AP requested discovery under Federal Rule of Civil Procedure 56(d), and DVapps responded in part to AP's discovery requests.  On November 24, 2022, the Court found that DVapps's partial discovery responses, together with a time-limited deposition of Vukanovic, were sufficient to allow AP to respond to the motion for summary judgment. That discovery was completed, and the motion for summary judgment is now ready for ruling.

Discussion

To succeed on its motion for summary judgment, DVapps must show that "there is no genuine dispute regarding any material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

To establish copyright infringement, a plaintiff must demonstrate: 1) ownership of a valid copyright; and 2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Incredible Techs.,*

*Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005).  Short phrases and expressions are not protected by copyright.  *See Alberto–Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972).  Neither are *scènes à faire*, defined as "incidents, characters, or settings which are as a practical matter indispensable, or at least standard in the treatment of a given topic."  *Incredible Techs., Inc.*, 400 F.3d at 1014.  The element of copying "may be inferred where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Id.* at 1011.  If "the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that defendant unlawfully appropriated the plaintiff's protectable expression by taking material substance and value," the works are substantially similar.  *Id.*

## A.    Access

In a case of copyright infringement, "[t]he plaintiff must always present sufficient evidence to support a reasonable possibility of access because the jury cannot draw an inference of access based upon speculation and conjecture alone."  *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984).  This is because "no matter how similar the two works may be (even to the point of identity), if the defendant did not copy the accused work, there is no infringement."  *Id.* at 901.  "[A] plaintiff may satisfy the [access] requirement by showing that the copyrighted work was 'sent directly to the defendant . . . or a close associate of the defendant.'"  *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1100 (7th Cir. 2017) (quoting *Selle*, 741 F.2d at 901).  A plaintiff can also prove access by submitting evidence that the "copyrighted work was so widely disseminated that the defendant can be presumed to have seen or heard it."  *Id.*

DVapps contends that AP has failed to offer evidence that would allow a reasonable jury to find that DVapps had access to AP's film. DVapps states that "all evidence indicates that [it] was completely unaware of [AP's] obscure film" and that "the idea of [DVapps's] Granny character evolved from [its] prior video game characters, not from copying of [AP's] obscure film." Def.'s Mot. for Summ. J. at 1.

The Court agrees with DVapps. There is no evidence in the record that would so much as suggest that the film was sent directly to Vukanovic or someone associated with him. He also stated in his declaration that he had never heard of the film, or seen anything related to it, prior to this lawsuit.

Nor does the evidence offered by AP—images of DVD and VHS packaging, licensing agreements, and links to Amazon and YouTube where the film can be purchased from resellers or watched in Spanish, respectively—give rise to a genuine dispute regarding widespread dissemination of the film. First, two out of the three license agreements submitted by AP are unreadable. And even assuming those images—or the images of DVD and VHS packaging—*do* establish that AP had licensing agreements and some physical media to distribute the film between 1999 and 2005, the agreements or images of packaging alone are not evidence of actual distribution. Perhaps more importantly, they do not serve as evidence of *widespread* distribution anywhere in the world, let alone in Vukanovic's home country of Sweden or any neighboring countries. AP has failed to offer any evidence of how many copies it or its licensees distributed, where they were distributed, or any evidence of the film's geographic reach at all.

Even if the record shows that the film was readily available online prior to

10

Vukanovic's creation of the game—and the Court is not certain that it does—the simple existence of the film on a public website would not permit a reasonable jury to find that Vukanovic accessed the film that way. The Seventh Circuit has expressly rejected the contention that presence on the Internet satisfies the access requirement for a copyright infringement claim. *See Design Basics, LLC*, 858 F.3d at 1106 ("the existence of www.designbasics.com, a website that Design Basics hails as prominent and user-friendly [and that advertises and markets all of its copyrighted works] . . . . does not raise a genuine issue of material fact as to access.").

In sum, there is no evidence to suggest that DVapps was given direct access to the film, and AP falls far short of giving rise to a genuine dispute regarding whether the film was so widely disseminated or readily available that DVapps should be presumed to have had access to it. This leaves AP with only one other path to raising an inference of access: via evidence of "striking similarity between the two works." *Selle*, 741 F.2d at 901.

## B.    Similarity

AP's claim fails because no reasonable jury could find that the two works are substantially similar. DVapps contends, and the Court agrees, that—after eliminating from consideration those aspects of the film that are not eligible for copyright protection—the film and the game are not substantially similar under the ordinary observer test, and that "[a]ll alleged similarities between the works are, at most, the result of shared ideas, with the resulting expression of those ideas being very different." Def.'s Mot. for Sum. J. at 1.

It has long been established that, when comparing two works for substantial

similarity, courts must eliminate unprotectable elements of the copyrighted work from the comparison. *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982) ("While dissection is generally disfavored, the ordinary observer test, in application, must take into account that the copyright laws preclude appropriation of only those elements of the work that are protected by the copyright.").  Many of the aspects of the film that AP claim DVapps misappropriated are not, in fact, protectable under copyright law. *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 363 (7th Cir. 2009) (the issue of copyrightability is a question of law—albeit one that is fact-specific—to be determined by the court).

Examination of both sides' comparison submissions leaves little doubt that the bases for AP's copyright claims are merely *scènes à faire* common to the horror genre. AP cannot prove infringement by relying on features in its film that are also found in the game but that are "so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another." *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004); *see also* 37 C.F.R. § 202.1 (familiar symbols or designs are not protected by the Copyright Act).  In addition to the murderous grandmother antagonist—a character trope that has long been used in all forms of media and entertainment, including in the horror genre—AP points to similarities such as:

> red lettering ([Pl.'s LR 56.1 SOF, Ex. 16] 00:10-00:20), use of a baseball bat (*id*. 00:30-00:45 and 2:44-3:10), blood stains in a basement (*id*. 00:48-1:10), a person walking on stairs (*id*. 1:12-1:40 and 5:26-6:00), existence of a basement (id. 1:45-2:15 and 6:04-6:27), blood spatter (*id*. 2:15-2:42), attacking with a weapon (*id*. 3:10-3:33), characters standing still (*id*. 3:39-4:28), a character being shot with a gun (*id*. 4:34-5:00), laying on the floor (*id*. 5:00-5:25), a house with a peaked roof (*id*. 6:32-6:49), a character with a face and shoulders (*id*. 6:50-7:57), and a granny in a car (*id*. 7:57-8:25).

Def.'s Reply at 7.  These elements, individually or collectively, are unquestionably *scenes à faire*.  *See e.g.*, *Tillman v. New Line Cinema Corp.*, 295 F. App'x 840, 842 (7th Cir. 2008) (holding that "sick children, caring fathers, hospital nurses, a beeping heart monitor, the lack of health insurance, praying, crying, and [common short] expressions" were "generic similarities far removed from the realm of protected expression.");  *See also Gaiman*, 360 F.3d at 659–60 (noting that "stock" characters such as an old drunken bum, are unprotected *scènes à faire*).  And AP itself apparently concedes that for "horror and slasher movies, the *genre* underscores the importance of surprise, which underscores the importance of fast-appearing, short scenes, without warning."  Pl.'s Resp. at 4.  AP further states that scenes with surprise attacks "are key to the horror genre."  *Id*. at 14.  Thus, the fact that the granny characters in both works at times appear suddenly to violently attack their victims can hardly be considered unique and copyrightable expression.[2]

AP also contends that many of DVapps's arguments inappropriately address differences between the overall feel, plot, structure, theme, and setting of the works rather than the similarity between specific scenes and images.  *See, e.g.*, Def.'s Mot. for Summ. J. at 9 ("Besides the presence of a scary elderly woman, there is nothing similar about these plots").  This argument ignores that DVapps did—to a certain extent in its motion and certainly in its reply—argue why the two works lack similarity even when analyzed on a more granular level.  *See id.* at 10 (comparing side-by-side images of the

---

[2] The Court notes that AP did not respond to DVapps's contention that the name "Granny" itself cannot be copyrighted under 37 C.F.R. § 202.1(a).  The Court therefore concludes that AP forfeited the point.  *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

film's granny character and the game's granny character) and 12 (comparing side-by-side images of the house in the film and the house in one version of the game).

Second, DVapps's approach is at least arguably supported by Circuit precedent. *See Atari*, 672 F.2d at 614 ("It has been said that [the ordinary observer] test does not involve analytic dissection and expert testimony, but depends on whether the accused work has captured the total concept and feel of the copyrighted work.") (citations omitted) (internal quotation marks omitted).

Third and most importantly, the result here is the same irrespective of whether the ordinary observer is evaluating similarity on an overall basis or via a frame-by-frame comparison of the works. The just-cited elements and scenes that AP contends DVapps copied are "similar only if described at a level that is so generic that the elements become completely divorced from any creative expression and merge with bare ideas." Def.'s Reply at 2; *see also*, *JCW Inv., Inc. v. Novelty*, *Inc.*, 482 F.3d 910, 917 (7th Cir. 2007) (it is a "fundamental tenet of copyright law that the idea is not protected, but the original expression of the idea is."). At best, the two works "share only small cosmetic similarities," all of which are unprotectable. *Peters v. West*, 692 F.3d 629, 636 (7th Cir. 2012).

In sum, AP has failed to establish that the accused elements of the game are substantially similar to its.[3]

## Conclusion

For the reasons stated above, the Court grants the defendant's motion for

---

[3] Given the Court's conclusion, it need not address DVapps's independent creation defense.

summary judgment [dkt. no. 26] and directs the Clerk to enter judgment in favor of the defendant and against the plaintiff. DVapps's request for an award of attorney's fees and costs under 17 U.S.C. § 505 should be addressed in post-judgment submissions consistent with the applicable Rules of Civil Procedure and Local Rules.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 9, 2023

15